Jonathan P. Vuotto, Attorney No. 021372004
McANDREW VUOTTO, LLC
13 Mt. Kemble Avenue
Morristown, New Jersey 07960
(973) 538-6308
Attorneys for Plaintiff, Unlimited Pins, LLC

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNLIMITED PINS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SCHENCK, PRICE, SMITH & KING, LLP and MICHAEL J. MAROTTE, ESQ.,<br><br>Defendants. | Case No. 23-cv-3338<br><br><br><br><br>**COMPLAINT<br>AND JURY DEMAND** |

Plaintiff, Unlimited Pins, LLC ("Plaintiff" or "UP"), by way of Complaint against Defendants, Schenck, Price, Smith & King, LLP ("SPSK") and Michael J. Marotte, Esq. ("Marotte") (collectively, "Defendants"), alleges as follows:

### PARTIES

1.      Plaintiff is a Florida limited liability company with two Members, Matt Lopatin ("Lopatin"), who is domiciled in Florida, and Richard Capparelli ("Capparelli"), who is also domiciled in Florida.

2.      On information and belief, Defendant SPSK is a limited liability partnership with no partners domiciled in Florida.  On information and belief, SPSK has multiple offices in New Jersey, including a principal place of business located in Florham Park, New Jersey.

3.      On information and belief, Defendant Marotte is an individual attorney who resides in New Jersey and is a partner in SPSK.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2).

## FACTS

6.      Beginning in July 2006, Lopatin and Capparelli retained Marotte and SPSK to prepare various documents and provide other legal services for various companies jointly owned by Lopatin and Capparelli, including: Direct Wholesale, Inc. ("DW"), Refco, LLC ("Refco"), and later, UP, Refco II, Inc. ("Refco II") and ePayNGo, LLC ("ePayNGo").

7.      In or around late 2008 or early 2009, Refco, DW and UP began making business-to-business loans to certain of their customers, one of which was PCS Wireless ("PCS").  The loan documents for each of these loans were prepared by Marotte.

8.      In April 2009, Marotte and SPSK prepared loan documents for a loan from UP to PCS.  In that process, UP introduced Marotte and SPSK to PCS's principal.

9.      In or around May 2009, Marotte, representing DW and UP, prepared the documents for a loan of approximately $2,000,000 from UP to V3, 231, LLC ("V3"), which is or was an entity owned and controlled by PCS's principal.

10.      In September 2009, Marotte, representing UP, prepared the documents for an additional $1,500,000 loan from UP to PCS.

11.      On information and belief, in or around 2009, without any notice and without requesting any waiver from UP, Marotte began representing PCS, V3 and/or their principal and/or other entities owned and/or controlled by their principal.  In the ensuing years, Marotte and SPSK

established a pattern and practice of favoring PCS, V3 and their principal's interests over those of Lopatin and Capparelli's jointly-owned companies.

12.     In November 2010, V3 requested that the loan from UP be increased to $5,000,000, and Lopatin and Capparelli agreed to the increase.

13.     As partial security for the increase in the loan from UP to V3, V3 gave UP a secured interest in a certain property located in Brooklyn, New York.  On information and belief, without requesting or otherwise obtaining a conflict waiver from UP, Lopatin or Capparelli, in or around February 2011 (but unknown to Lopatin or Capparelli until August 2017), Marotte represented an entity with the same owner as V3 with respect to various matters regarding the Brooklyn property. This was the same property for which Marotte had also drafted the loan documents under which the property was security for the loan from UP to V3.  On information and belief, Marotte's actions in this regard jeopardized UP's security.  UP would not have consented to Marotte being involved in representations relating to the Brooklyn property, but UP was kept in the dark by Marotte and therefore not given a choice.

14.     In September 2011, based on material misrepresentations made by Marotte, who, unbeknownst to UP at the time, was also representing V3, UP agreed to increase its loan to V3 from $5,000,000 to $7,500,000.  Marotte prepared the loan documents for the increased loan amount.

15.     In March 2012, Marotte advised UP that V3 was looking for bank refinancing of the $7,500,000 loan from UP secured by the Brooklyn property, so that V3 could secure a better interest rate than the UP loan, which accrued interest at 26%.  At that time, V3 owed UP $7,500,000 in principal and UP believed that V3 owed approximately $485,000 in accrued interest (in fact, V3 owed much more).  V3 and Marotte requested that, in order for V3 to obtain the bank

financing, UP agree to separate V3's accrued interest on the loan and create a new short-term loan for the interest amount owed by V3 to UP.  At that time, specifically on March 8, 2012, among other times, Marotte represented to Lopatin and Capparelli that Marotte would draft the loan documents for the new short-term loan of the accrued interest.  On information and belief, Marotte was clandestinely representing V3 in the refinancing and also representing UP with respect to the payoff of UP's loan principal and the preparation of the new short-term loan documents – in breach of Marotte and SPSK's fiduciary and ethical duties to UP.  UP would not have consented to such a conflicted representation had it been made aware of Marotte's pattern and practice of deceit and double-dealing.

16.     Capparelli was hesitant to allow the principal amount of the loan to V3 to be paid off without V3 providing security for the substantial accrued interest, particularly for a short-term loan with undocumented terms.  Marotte assured UP in writing that he would not provide the signed document evidencing satisfaction of the $7.5 million loan to anyone until after UP had been paid the $7.5 million (but later, in 2017, UP discovered that Marotte provided the document to multiple parties prior to UP being paid the $7.5 million – another misrepresentation by Marotte).  Marotte also assured Lopatin and Capparelli that the new short-term loan would be documented and would contain the same terms, including the 26% interest rate, as the prior loan.  Marotte also represented to Capparelli that Lopatin had agreed to the payoff and new short-term loan.  Based on Marotte's representations and not knowing that Marotte was representing V3 on the same loan transaction, Capparelli consented to the proposed new short-term loan transaction with V3 (the "V3 Loan").  Lopatin and Capparelli understood, based on Marotte's multiple representations, that Marotte was going to prepare the loan documents for the V3 Loan and include an interest rate of 26% and other terms consistent with the existing $7,500,000 loan to V3 that was to be paid off.

17.     On or about March 13, 2012, Marotte advised UP that V3 wired $7,500,000 into SPSK's attorney trust account maintained for UP.  Marotte's statement was not accurate, however. Marotte failed to advise UP that the amount wired into the trust account maintained for UP was $7,502,793.00 and that SPSK transferred $2,793.00 from the SPSK attorney trust account maintained for UP into another SPSK account maintained on PCS's behalf, without obtaining UP's authorization or even providing UP with notice.  Marotte was representing both UP and V3 in the same transaction, without UP's consent, and improperly utilizing SPSK's trust accounts.

18.     In October 2012, as a result of disputes between Lopatin and Capparelli, Capparelli filed a lawsuit in Florida seeking to dissolve UP and a custodian was appointed for UP.

19.     The V3 Loan became an issue in the dispute between Lopatin and Capparelli, and in January and February 2013, both UP's custodian and Capparelli requested the V3 Loan documents and all related documents from Marotte.  At that time, Capparelli did not know that Marotte had failed to prepare the V3 Loan agreements.  It was discovered later that Marotte never prepared the V3 Loan documents, which was to V3's benefit but in breach of Marotte's duties to UP.

20.     Lopatin and Capparelli had no reason to think that Marotte would not prepare the documentation for the V3 Loan.  Over the years that Marotte and SPSK represented the various companies jointly owned by Lopatin and Capparelli, Marotte prepared the loan documents for over 60 business-to-business loans made by Refco and Refco II and approximately 10 business-to-business loans made by UP.  UP trusted Marotte to prepare the V3 Loan agreements and to adequately protect UP's interests and, again, UP did not know that Marotte was also representing V3.

21.     In March 2013, a second lawsuit was filed, this time in New Jersey, involving the partnership dispute between Lopatin and Capparelli and their various companies.

22.     In May 2013, Lopatin and Capparelli entered into a Settlement Agreement under which they would dissolve UP, DW and ePayNGo, and the partners agreed to select Marotte as the neutral arbitrator on a three-arbitrator panel, the purpose of which was to hear and resolve any disputes relating to the wind-down of the three companies (the "Arbitration").  Lopatin and Capparelli believed at the time that Marotte, as the companies' long-time counsel who had substantial knowledge of the companies, would be neutral and would act in the companies' best interests.

23.     As of August 2013, Marotte's hourly rate was $295 per hour for work on behalf of UP and Lopatin and Capparelli's other jointly-owned companies.  Nevertheless, in August 2013, Marotte prepared an arbitration agreement for Lopatin and Capparelli providing for the three-arbitrator panel, including Marotte as a "neutral" arbitrator and one arbitrator selected by each Lopatin and Capparelli, with each arbitrator billing at $600 per hour – more than double Marotte's regular rate.  Nevertheless, Lopatin and Capparelli agreed to the arbitration contract (the "2013 Arbitration Agreement") because it was specific as to who and what could be billed to UP for the Arbitration.

24.     The 2013 Arbitration Agreement provides, among other things, that "the only fees paid by the companies in connection with the mediation/arbitration will be the fees paid to the three arbitrators for actually conducting and administrating the arbitration under paragraph 7 of this letter agreement."  The 2013 Arbitration Agreement further provides that "[e]ach of the arbitrators will bill for their services based on an hourly rate of $600."  Under the 2013 Arbitration Agreement, UP initially deposited $30,000 in SPSK's trust account to be used to pay the

arbitrators' fees, and Marotte was to pay the arbitrators' fees from the SPSK trust account upon submission of bills showing the hours expended and the hourly rate charged.  (UP later made various deposits of over $1.2 million more to be held in trust by SPSK for the Arbitration.)  The Agreement further provides that Marotte "will not seek nor obtain [Lopatin and Capparelli's] approval before paying such bills, but copies of the bills will be shared with both of the other arbitrators."

25.     Lopatin and Capparelli found out nine years later, in 2022, that not only had Marotte effectively charged $630 rather than $600 per hour for his work by attaching an unauthorized 5% cost, but he also allowed approximately 10 other SPSK attorneys, regardless of experience level or regular hourly rate, to bill substantial time towards the Arbitration (over 75 time entries), mostly at an effective rate of $630 per hour, without Lopatin and Capparelli's knowledge or authorization.  Lopatin and Capparelli trusted Marotte in 2013, which is why they gave him the authority under the 2013 Arbitration Agreement to review and pay the arbitrators' bills.  Marotte took advantage of this provision, however, and abused his authority by allowing other SPSK attorneys to bill UP as if they were arbitrators "actually conducting and administrating the arbitration" or as if the fees were "incurred in connection with [Marotte's] role as a member of the Panel" – which they were not – and Marotte allowed this beginning with the very first SPSK bill for Marotte as the 'neutral arbitrator' in 2013.  This was an egregious breach of Lopatin and Capparelli's trust in Marotte and SPSK and a breach of the 2013 Arbitration Agreement.  This pattern and practice of having other SPSK attorneys bill as an "arbitrator" went on from the beginning of the Arbitration in 2013 through the last arbitration bills provided by SPSK in 2022 – for nine years – because SPSK concealed it from UP.

26.     In October 2013, the Arbitration panel (including Marotte) determined in the Arbitration that Lopatin was to be responsible for negotiating with V3 to collect the monies owed under the V3 Loan, which were not fully paid by that time.  The panel (including Marotte) further determined that, if Lopatin did not collect at least 75% of the amount owed to UP, then UP was to initiate a lawsuit against V3.  As of September 2013, according to Lopatin's calculation, V3 owed UP approximately $166,000 under the V3 Loan.  Lopatin was unsuccessful in collecting any of the $166,000 owed by V3 at that time.

27.     In March 2015, Marotte requested that Lopatin and Capparelli enter into a new arbitration agreement (the "2015 Arbitration Agreement").  It is unclear why Marotte felt that a new arbitration agreement was necessary at that time, but, on information and belief, Marotte was attempting to broaden the scope of what he and SPSK could bill UP for, without openly divulging this to UP.

28.     Under the 2015 Arbitration Agreement, Marotte was to continue serving as the sole "neutral" arbitrator and Lopatin and Capparelli each chose one arbitrator to constitute the panel. With respect to the arbitrators' fees, the 2015 Arbitration Agreement provides that the "only fees paid by Unlimited Pins in connection with the arbitration proceedings will be the fees of the arbitrators serving on the Panel incurred in connection with their role as a member of the Panel, and not as an Advocate."  The 2015 Arbitration Agreement further provides that the "Arbitrators serving on the Panel will each bill for their services based on an hourly rate of $600 per hour" and that UP will pay the arbitrators' fees.  As with the 2013 Arbitration Agreement, under the 2015 Arbitration Agreement, Marotte was given the authority to review the arbitrators' bills and was not required to seek nor obtain Lopatin or Capparelli's approval before paying those bills.

29.     Despite the 2015 Arbitration Agreement's specificity as to UP paying only "the fees of the arbitrators serving on the Panel incurred in connection with their role as a member of the Panel" and the $600 hourly rate, as noted above, in 2022 UP discovered that SPSK billed substantial time towards the Arbitration for at least 10 SPSK attorneys other than Marotte, and often at an effective rate of $630 per hour rather than $600 per hour.  Again, Marotte's actions in this regard were a breach of the trust that Lopatin and Capparelli placed in Marotte and a breach of the 2013 and 2015 Arbitration Agreements.

30.     On or about March 13, 2015, UP sent $5,699,961.55 to SPSK, which SPSK was to hold in escrow for the payment of UP's expenses and liabilities as Lopatin and Capparelli wound-down UP's operations and resolved the disputes between them.  Similarly, on or about March 19, 2015, DW sent $264,961.55 to SPSK to hold in escrow for the payment of DW's expenses.  Previously, in December 2014, ePayNGo sent $250,000.00 to SPSK to hold in escrow.  (In December 2016 ePayNGo's $250,000 was transferred from SPSK's ePayNGo escrow account to the DW escrow account, because ePayNGo was indebted to DW.)  From 2015 until sometime in 2022, SPSK would send Lopatin and Capparelli annual statements for all UP and DW escrow accounts maintained by SPSK.

31.     In May 2015, Lopatin and Capparelli entered into a 'collections' Settlement Agreement (the "Collections Agreement") under which Marotte was to resolve any disputes between Lopatin and Capparelli with respect to certain collections matters for debts owed to UP and DW, respectively.  In a document provided by Lopatin to Marotte, Lopatin listed V3 as owing $150,000 to UP under the V3 Loan.

32.     In June 2015, under a procedure agreed to by Lopatin and Capparelli, Capparelli was determined to be responsible for collecting the amounts owed under the V3 Loan.  Capparelli

sought to retain SPSK as UP's counsel for a lawsuit against V3.  SPSK, however, declined the representation, notifying Capparelli that SPSK was also representing V3.  This came as a shock to Capparelli, who was told by Marotte in or around 2011 that, if there were ever a lawsuit between UP and PCS or V3, that SPSK would represent UP and not PCS or V3.  SPSK referred UP to another law firm to handle the collection suit against V3 – Donnelly, Minter & Kelly, LLC ("DMK") – which, unknown to UP at that time, had many connections with SPSK.

33.     In August 2015, DMK filed a lawsuit in the New Jersey Superior Court on UP's behalf against V3, seeking to collect the remaining amounts owed to UP under the V3 Loan (the "V3 Litigation").

34.     V3 failed to timely respond to UP's Complaint in the V3 Litigation and therefore default was entered against V3 in January 2016.  DMK, however, did not immediately move for final judgment by default, because, on information and belief, DMK was waiting for Marotte to provide documentation to verify the amounts owed, but Marotte failed to do so until, about a year later, in December 2016, after the discovery end date had passed.  In fact, DMK and UP each made multiple written requests for all of SPSK's files relating to the V3 Loan, but Marotte and SPSK failed to produce all their files, in flagrant breach of their duties to UP and in furtherance of V3's interests.

35.     UP was unaware at that time that Marotte, without notifying UP, was attempting to either broker a deal for V3 or, on information and belief, was assisting V3 with obtaining counsel to defend against UP's action, and otherwise was attending to V3's interests, rather than UP's.  Marotte had substantial confidential information regarding UP and its claims against V3 and, on information and belief, conveyed that information to V3, in breach of Marotte's fiduciary obligations to UP and causing UP substantial prejudice.  Marotte's improper actions and omissions

10

significantly delayed UP in obtaining a default judgment and gave V3 an inside and unwarranted advantage in the V3 Litigation.

36.     On October 13, 2016, although it still had not obtained the V3 loan files and other necessary information from Marotte, DMK moved for a default judgment against V3.  On October 17, 2016, UP obtained a Default Judgment against V3 in the amount of $482,262.43.

37.     Not coincidentally, right around this same time V3 apparently became aware of UP's Default Judgment (because Marotte was providing V3 with confidential information in breach of his obligations to UP).  V3 retained counsel, and on October 21, 2016, moved to vacate the default and subsequently sought to vacate the Default Judgment.

38.     On October 26, 2016, V3 offered to pay $152,000 to settle the V3 Litigation. Lopatin required that Marotte determine whether the settlement offer was sufficient, in accordance with the Collections Agreement.  Marotte failed to determine whether V3's offer was sufficient – he simply did not respond.  Notably, although Marotte ruled on over a dozen disputes submitted to him by Lopatin and Capparelli under the Collections Agreement, Marotte never issued a decision on the dispute as to whether UP should accept the $152,000 settlement offer from V3 – in breach of Marotte's fiduciary obligations and in breach of the Collections Agreement.  Marotte was hopelessly conflicted due to his representations of both UP and V3, and apparently chose to do nothing rather than rule against his client V3, or disclose his conflicts and allow for an alternative resolution of the V3 settlement proposal.

39.     The court in the V3 Litigation heard argument on V3's motion to vacate the Default Judgment on March 28, 2017.  On that same morning, prior to the court hearing, DMK disclosed to Capparelli that Marotte, also on that same morning, had forwarded to DMK the emails that Marotte had already provided to V3's counsel, which were emails between Marotte and DMK that

11

were intended to be confidential, attorney-client privileged communications. UP understands that DMK – in an attempt to protect their personal friends at SPSK[1] and Marotte – cut a deal with V3's counsel to not bring this to the Judge's attention.

40.     In early 2017, V3 increased its settlement offer to UP to $200,000. UP, in conjunction with DMK's recommendation and with the information available to UP and DMK at that time (because Marotte continued to intentionally withhold the V3 Loan files that were in his possession, to UP's detriment), rejected V3's settlement proposal because it believed that the offer was too low. Had DMK and UP been in possession of the V3 Loan files at that time and thus been properly advised of the position UP was in, UP would have accepted V3's offer and thus resolved the V3 Litigation. Due to Marotte's atrocious, intentional failure to comply with his fiduciary obligations to UP and instead protect the interests of V3, and also his manipulation of DMK, UP lost the opportunity to settle the V3 Litigation, obtain a recovery and staunch the legal costs it was incurring in the V3 Litigation.

41.     As an additional egregious action, during the course of the V3 Litigation, Lopatin made multiple requests for Marotte to review DMK's invoices to UP, including those on the V3 matter, to determine whether the fees were reasonable. Marotte, who was betraying UP by not providing UP with the information necessary to either prevail in or settle the V3 Litigation, also regularly approved DMK's invoices for two years, which were incurred for work that would not have been necessary but for Marotte's backstabbing. Nevertheless, Marotte found all of DMK's invoices, including those on the V3 matter, to be "reasonable." Thus, Marotte imposed a virtual whipsaw of damages on UP with his improper actions and omissions.

---

[1] Marotte and other SPSK attorneys were friends with multiple DMK attorneys – with at least one of the friendships having been in place for multiple decades.

42.     On April 4, 2017, the court granted V3's motion to vacate the Default Judgment. The court found that V3's failure to timely respond to UP's Complaint was excusable and that V3 alleged a potentially viable defense – that the V3 Loan had been satisfied in full.

43.     On information and belief, Marotte, in an effort to protect his client, V3, and to the detriment of his other client, UP, provided V3 with a signed Satisfaction of Note with respect to the prior, $7.5 million loan to V3.  Additionally, on or about June 28, 2017, Marotte provided V3's attorneys with a signed Affidavit (the "Marotte Affidavit") that was carefully crafted to deceive the court and scuttle V3's loan obligations to UP.

44.     In June 2017, prior to providing V3 with the Marotte Affidavit, Marotte told Capparelli that V3's lawyers had asked him to provide an affidavit regarding the $7.5 million loan payoff, but that Marotte would not provide an affidavit regarding the V3 matter without first speaking with DMK and Capparelli and without going over the wording of any affidavit with them. Marotte, however, did not contact either DMK or Capparelli again about V3's request for an affidavit.  Instead, in late June 2017, DMK and UP received the Marotte Affidavit from V3's attorneys in opposition to UP's motion for leave to amend UP's Complaint, without previously reviewing the affidavit or being allowed any discussion with Marotte about its contents.

45.     The Marotte Affidavit provides that: (i) Marotte and SPSK served as UP's attorneys "in connection with a loan made to V3 231 LLC on or about December 10, 2010"; (ii) the principal amount of the V3 Loan was paid off on or about March 13, 2012; (iii) additional interest in the approximate amount of $450,000 remained due and owing as of March 13, 2012; (iv) V3 "made additional payments to Unlimited Pins LLC totaling $450,000 after March 13, 2012; and (v) "the $450,000 payment and any amounts which remained due and owing after the March 13, 2012

13

payoff were not memorialized as a new loan and were not the subject of a new note or loan agreement."

46.     Marotte failed to advise the court in the V3 Litigation, however, that the amounts owed under the V3 Loan were "not memorialized as a new loan and were not the subject of a new note or loan agreement" due to Marotte's negligent or intentional failure to prepare those loan documents despite his multiple statements that he would, and his misrepresentations leading UP to believe that he did.  Marotte also failed to advise the court that the parties understood and agreed that the V3 Loan was to accrue interest at 26%, such that, even if V3 had ultimately made several partial payments to UP, there would still be substantial amounts due from V3 to UP for interest owed on the V3 Loan.  Marotte also failed to advise the court that any Satisfaction of Note with respect to the prior, $7.5 million loan to V3 would not have satisfied the V3 Loan and was intended solely for V3 to be able to refinance the Brooklyn property with a bank loan.  Marotte also failed to advise the court that he represented UP and V3 in connection with loans by UP to V3.  Marotte simply sabotaged UP's claim against V3.  Had Marotte provided full disclosure to the Court, then his credibility would have been destroyed and V3 would have been given no advantage in the V3 Litigation.

47.     Furthermore, Lopatin and Capparelli often sought the advice of Marotte and relied upon his advice, so when Marotte advised them to sign the Satisfaction of Note for the $7,500,000 loan and represented that he was going to prepare documents for the new V3 Loan, Lopatin and Capparelli believed Marotte's representations.  At one point, Capparelli had even stated in writing that no one should sign the proposed Satisfaction of Note on UP's behalf, because it was not accurate due to it not reflecting the open interest amounts, for which there were to be new loan documents prepared.  Marotte then fraudulently induced Capparelli to allow the Satisfaction to be

signed, because Marotte said that he would prepare the new loan agreements – but Marotte never did.  Capparelli had no reason to believe that what Marotte said was not true at the time.  Also, Marotte rushed Capparelli to agree to the Satisfaction of Note to be signed (again, in furtherance of V3's interests).  Marotte did not tell Lopatin or Capparelli the full facts and circumstances and that Marotte had no intention of providing a new loan document, and that, rather, Marotte had malicious intent to conceal critical information from UP and to defraud UP and the new lender.  Capparelli reasonably relied upon Marotte's representations based upon their long-standing attorney-client relationship and a personal friendship that had developed over the years.  As but one example of the extent to which Lopatin and Capparelli had trusted Marotte, since 2006, the companies jointly owned by Lopatin and Capparelli provided SPSK with a substantial amount of work and paid SPSK over $3.3 million dollars.

48.     Rather than adequately and properly advising UP on the many detriments of agreeing to the Satisfaction of Note, without V3 first signing a new loan document on the remaining interest and despite Capparelli's initial concerns and reservations about allowing the Satisfaction of Note to be signed, Marotte nevertheless advised UP that it would be beneficial to UP to agree to sign the Satisfaction of Note.  Marotte's advice to UP regarding the proposed refinancing transaction was woefully inadequate and ultimately resulted in UP losing the remaining substantial interest amounts owed to UP by V3.

49.     V3 moved for summary judgment and to impose sanctions on UP for allegedly seeking to collect on a loan that was not owed.  DMK, which was a new law firm at the time, and faced with the highly improper actions of DMK's friend, Marotte/SPSK, sought to dismiss UP's Complaint in the V3 Litigation and did not timely oppose V3's summary judgment motion.  Rather, DMK sought to be relieved as UP's counsel due to a "potential conflict" arising.  DMK,

similar to its friend Marotte/SPSK, essentially 'gave up' on UP and left UP to find new counsel in an action that had been completely upended by Marotte.  In a meeting with UP, DMK and Marotte in July 2017, Marotte admitted that providing the Marotte Affidavit to V3 was a mistake.  Marotte attempted to defend himself, however, by stating that UP was no longer a client of SPSK, which was a material misrepresentation and complete fantasy, because SPSK continued to bill UP for legal services through 2022 (and even had the gall to improperly bill UP in March 2023, despite the fact that the parties were in an open dispute by then).  DMK and V3's attorneys subsequently attempted to reach a deal between UP and V3 whereby the parties would "walk away," but V3, in an effort to protect Marotte, insisted that UP give Marotte a full release in connection with this proposal, including for matters relating to the Marotte Affidavit, in connection with the proposed V3 settlement.  UP refused to give Marotte – who was not even a party to the V3 Litigation – such a broad release for no consideration.  DMK then told UP that they would have to find a new attorney, because they would not be adverse to Marotte and SPSK.

50.    Until UP received the Marotte Affidavit and began investigating Marotte's ties to V3, PCS and their principals, UP was unaware of the extent to which Marotte and SPSK had been representing those parties.  Unbeknownst to UP, Marotte was involved with them to the point that Marotte and SPSK were registered as V3's agent for service of process in the State of New York as early as 2010.  Had UP known that Marotte and SPSK had such close ties to V3, PCS and their principals, and had UP not been deceived by Marotte about the extent of the relationship, UP would not have trusted Marotte, would not have used SPSK for so many legal services, would not have used DMK for the V3 Litigation (and other matters), and could have avoided being sabotaged by Marotte in connection with the V3 Loan.

51.     In July 2017, Capparelli terminated Marotte as the "neutral arbitrator" in the Arbitration, because Marotte had proven himself conflicted and untrustworthy in the V3 Litigation. After Capparelli terminated Marotte as the "neutral arbitrator," Marotte declined to serve further as the decider under the Collections Agreement.

52.     On September 22, 2017, the Court entered an Order granting in part V3's summary judgment motion, which mostly dismissed the V3 Litigation, and left UP with essentially nothing but high legal bills due to Marotte's improper actions and omissions.

53.     In 2018, Capparelli considered rescinding the termination of Marotte as neutral arbitrator.   In exchange for the proposed rescindment, Marotte repeatedly asked for a new arbitration agreement with a release from Lopatin, Capparelli and all their jointly-owned companies for all matters, known and unknown, including those relating to the V3 Litigation. Marotte made multiple misrepresentations to Capparelli that it was supposedly Lopatin who was requesting a new arbitration agreement that was to include the release, which was untrue.  Marotte also sought to include in the proposed new arbitration agreement a provision that Marotte could not be terminated as 'neutral arbitrator' for any reason, which was completely unacceptable to UP and in contradiction to the May 2013 Settlement Agreement entered into between Lopatin and Capparelli – which Marotte had and was aware of.  Marotte represented to Lopatin and Capparelli, and to the other arbitrators, on multiple occasions, that without a new arbitration agreement, Marotte could not act as an arbitrator.  Nevertheless, Marotte billed UP as an arbitrator from after July 23, 2017, when he was terminated, for time allegedly spent on a proposed new arbitration agreement that was never entered into.  SPSK billed UP over $142,000 (under the arbitration matter number at SPSK) relating to the proposed new arbitration agreement, which UP never asked SPSK to do and never agreed to.  Not only was the work on the proposed new arbitration agreement

completely unwarranted and unnecessary, but it was an open and flagrant gouging of UP.  SPSK spent over 200 "billable" hours on preparing a simple arbitration agreement that did not need to be any more complicated than either the 2013 Arbitration Agreement, which was three pages long, or the 2015 Arbitration Agreement, which was five pages long.  Furthermore, Lopatin and Capparelli continue to operate under the same 2015 Arbitration Agreement today that was entered into in 2015 (except there was a one-page addendum providing that Judge Frank Ciuffani replaced Marotte as the neutral arbitrator, and Josh Migdal replaced Ira Marcus as Lopatin's chosen arbitrator).  The proposed new arbitration agreement that Marotte was insisting on for two years was completely unnecessary and the so-called negotiations for the proposed new arbitration agreement served no purpose except to try to provide Marotte and SPSK with a full release of all known and unknown issues that had ever arisen at any time in the past – a release that Marotte had been asking for since 2017 in connection with the V3 Litigation.  In short, Marotte and SPSK extensively overbilled UP for work that had no purpose other than to seek to benefit Marotte and SPSK, not UP, and ultimately was not used anyway.

54.    In March 2020, on application to the Superior Court, it was determined that Marotte was not entitled to a release.  On the Court's direction by Order dated March 25, 2020, Lopatin and Capparelli selected a new neutral arbitrator.

55.    On April 8, 2020, Capparelli sent an email to Marotte approving the only non-arbitration 2020 bills that were sent to him as of that date.  In that email, Capparelli approved paying UP invoice numbers 1072093 for $189.00 and 1074822 for $75.60.  The total Capparelli authorized to be paid to SPSK from the monies being held in escrow by SPSK for UP was $264.60.  The payment that SPSK processed for UP on April 20, 2020 (the only payment processed to SPSK in 2020 for UP) according to the SPSK Trust Details Report that Marotte provided was for

$2,646.00.  Capparelli pointed this out to Marotte on a later phone call, and Marotte refused to give that overpayment back to UP.  The payment of $2,646.00 instead of $264.60 was an unlawful and unethical conversion of $2,381.40 from UP's escrow account without permission of Capparelli.  In the same April 20, 2020 email, Capparelli had approved payment for SPSK invoice number 1072091, which was for $113.40.  The payment that SPSK processed for DW (the only payment processed to SPSK in 2020 for DW) from the DW Escrow Monies held at SPSK, according to the SPSK Trust Details Report that Marotte provided was for $2,944.15.  Capparelli pointed this out to Marotte on a later phone call, and Marotte refused to give that overpayment back to DW.  SPSK's taking of a payment in the amount of $2,944.15 instead of $113.00 was an unlawful and unethical conversion of $2,830.75 from DW's escrow account without permission of Capparelli.  Thus, Marotte and SPSK clearly have an established reckless disregard for their trust accounting and ethical obligations.

56.     In June 2020, Capparelli requested that Marotte provide Capparelli and Lopatin with all Arbitration invoices so that they could complete tax returns for UP.  Marotte refused to provide the invoices, on the purported basis that Marotte was supposed to be acting as a neutral arbitrator, not as an attorney-advocate.  Under the 2015 Arbitration Agreement, the arbitrators' respective invoices are not privileged, and in fact, the Agreement provides that "Marotte shall be permitted to provide copies of any emails and documents that either Rich or Matt . . . may request and Marotte's response shall be copied to Rich, Matt and their Advocates."  Thus, Marotte's refusal to provide the invoices was a baseless violation of the 2015 Arbitration Agreement, which the parties are still operating under today.

57.     In or about February 2022, Capparelli's arbitration counsel submitted a formal request for the arbitrators' invoices, so that UP could complete its tax returns.  After several

months, Marotte provided the amounts of the payments paid to each of the arbitrators, but he did not produce the invoices.

58.     In late August 2022, after haggling back and forth with SPSK and Marotte and obtaining an order from the Arbitration panel authorizing a subpoena to SPSK, it was temporarily agreed that SPSK would produce redacted invoices so that UP's tax returns could be prepared. Marotte produced invoices from which the description of services was redacted but most other information was included.  UP's accountant, however, later advised UP that it would need the unredacted invoices from SPSK in the event of a likely IRS audit.

59.     Despite multiple subsequent demands for unredacted copies of SPSK's invoices to UP in the Arbitration, three years later, SPSK has still refused to produce unredacted copies of the invoices.  Notably, Marotte was the only arbitrator who would not provide unredacted copies of his invoices.  Every other arbitrator provided unredacted copies of their bills to UP.

60.     As a result of the issues between UP and SPSK, on October 21, 2022, Lopatin and Capparelli directed Marotte to transfer all monies held in escrow by SPSK on behalf of UP, DW and Refco, to a new escrow agent.  Despite holding millions of dollars belonging mostly to UP (but also some smaller amounts belonging to DW and Refco), Marotte and SPSK refused to transfer the funds, or even to respond to Lopatin and Capparelli's requests, for months – further demonstrating SPSK's pattern and practice of breaching their duties as an escrow agent.

61.     In January 2023, Marotte responded that SPSK would transfer the escrowed funds to the new escrow agent, but that SPSK would retain $130,000, all of which are UP's funds, that Marotte stated were to be applied to SPSK legal fees.  Lopatin and Capparelli objected to SPSK retaining $130,000 for "fees," but they did not want to further delay the transfer of the remaining funds.

62.     Therefore, after additional back-and-forth in an effort to recover most of the approximate $2 million that SPSK was improperly retaining, in February 2023, SPSK partially relented and transferred approximately $1.9 million of the escrowed funds to UP, retaining the $130,000 that SPSK claims it is owed for legal fees.  UP disputes that any amount is owed to SPSK for legal fees.

63.     After SPSK transferred most of the escrowed UP funds to UP's new escrow agent, Lopatin and Capparelli requested that SPSK provide a Trust Details Report for each of the eight escrow accounts at SPSK that held funds for Lopatin and Capparelli's jointly-owned companies, for tax preparation purposes.  SPSK ignored Lopatin and Capparelli's requests for the Trust Detail Reports.  As a result of SPSK's failure to provide UP with a statement of its escrow account monies being held by SPSK for 2022, in breach of SPSK's duties as escrow agent, UP is being prevented from completing its 2022 tax returns.

64.     On May 3, 2023, UP demanded that SPSK and Marotte turn over the $130,000 that SPSK continues to improperly retain.  UP further demanded that SPSK produce: (i) all unredacted invoices for Marotte and SPSK's "work" on the Arbitration; and (ii) all Attorney Trust Detail Reports for UP.

65.     Despite UP's demand, SPSK has not turned over the subject funds, has not provided the unredacted invoices or the Trust Detail Reports, and has not substantively responded to UP's demand.

66.     The multiple and egregious actions and omissions made by Marotte and SPSK as UP's attorneys and as UP's escrow agents as outlined herein proximately resulted in UP incurring substantial ascertainable damages.  Furthermore, Marotte's breaches of the 2013 Arbitration Agreement and the 2015 Arbitration Agreement resulted in UP incurring substantial damages.  As

a result of Defendants' refusal to turn over UP's funds held in trust by SPSK, UP has incurred damages in the way of interest on the over $2 million of UP's funds SPSK wrongfully retained for four months and the $130,000 currently being wrongfully retained since October 2022.  As a result of Defendants' refusal to provide adequate trust reporting, UP is incurring irreparable harm.

<u>**COUNT ONE**</u>

<u>**ATTORNEY MALPRACTICE**</u>

67.    Plaintiff repeats and realleges all of the allegations contained above as if fully set forth herein.

68.    UP retained SPSK and Marotte to represent UP's interest in connection with the V3 Loan.

69.    As UP's attorneys, Marotte and SPSK owed UP a duty of care, requiring Defendants to exercise a certain level of skill and diligence in representing UP's interests.

70.    Specifically, UP understood and anticipated that Marotte and SPSK would draft all necessary loan documents for the V3 Loan, because Marotte repeatedly told UP that he would be preparing those loan documents.

71.    Defendants breached their duty to Plaintiff by failing to exercise the ordinary and reasonable skill commonly exercised by attorneys by not diligently, adequately, and properly advising and representing Plaintiff in connection with the V3 Loan by not preparing the new loan documents despite Marotte's representations that he would.

72.    If Marotte had prepared the new V3 Loan documents as he said he would, then UP's interest in the V3 Loan would have been protected and UP would not have suffered a substantial loss on the V3 Loan.  Alternatively, had Marotte adequately advised UP that he was not going to prepare the new loan documents and disclosed to UP that he had a conflict of interest,

then UP could have taken appropriate action by engaging another attorney to prepare the loan documents and protect UP's interests in the V3 Loan.

73.     Defendants' actions and omissions constitute failures to exercise the ordinary and appropriate level of reasonable skill, prudence and diligence commonly used by attorneys.

74.     But for Defendants' negligence, Plaintiff would have been able to successfully defend against V3's counterclaims and prevail on UP's claims in the V3 Litigation, and come to an appropriate resolution of the matter.

75.     But for Defendants' negligence, Plaintiff would not have consented to the V3 Satisfaction of Note document and would not have incurred other substantial damages in attempting to rectify the critical error caused by Defendants' negligent advice and failure to properly protect UP's interests by preparing the new V3 Loan documents.

76.     As a result of Defendants' negligence, Plaintiff has incurred substantial damages in an amount to be proven at trial, but not less than $500,000, plus interest, attorneys' fees and expenses.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined at trial, plus interest, disgorgement of prior attorneys' fees paid to Defendants, attorneys' fees and costs of this action under <u>Saffer v. Willoughby</u>, 143 <u>N.J.</u> 256 (1996), and any other or further relief for Plaintiff that the Court finds just and equitable.

<u>**COUNT TWO**</u>

<u>**BREACH OF CONTRACT**</u>

77.     Plaintiff repeats and realleges all of the allegations contained above as if fully set forth herein.

78.     UP was one of the companies jointly owned by Lopatin and Capparelli that was a subject of the 2013 Arbitration Agreement and the 2015 Arbitration Agreement, and all of Defendants' bills under those Agreements were paid by UP.

79.     Under the 2013 Arbitration Agreement, Marotte, and no one else at SPSK, was to bill their services "for actually conducting and administrating the arbitration."  Under the 2015 Arbitration Agreement, Marotte was entitled only to fees "incurred in connection with [his] role as a member of the Panel."

80.     Defendants breached the 2013 Arbitration Agreement and the 2015 Arbitration Agreement by allowing more than 10 other SPSK attorneys who were not members of the arbitration panel to improperly bill time towards the Arbitration.

81.     On information and belief (because Marotte and SPSK have refused to produce unredacted copies of their invoices), Marotte and SPSK seriously and repeatedly overbilled UP for services that were not billed by Marotte and were not for either: (i) "actually conducting and administrating the arbitration"; or (ii) fees "incurred in connection with [Marotte's] role as a member of the Panel."

82.     In fact, from March 2017 through May 2020, SPSK billed UP for, and paid itself, $173,053.24 of UP's funds held in trust with SPSK for payment of Arbitration bills.  During the same time period, the other two arbitrators on the panel billed UP $38,400 and $29,000, respectively.  Thus, SPSK billed 580% more than the other arbitrators and has not provided any explanation for why this "work" was necessary for conducting and administrating the Arbitration or in connection with Marotte's work on the arbitration panel (or why Marotte and SPSK billed UP for such work since 2017 when Marotte was terminated from the panel) – and refuses to allow UP to review SPSK's invoices so that it can evaluate exactly what SPSK was doing and why.

83.    In furtherance of Defendants' breach of contract, Defendants have concealed what work they have purportedly done on the Arbitration by providing only redacted invoices to UP.

84.    Additionally, although in 2017 Marotte was terminated as the "neutral arbitrator" for the Arbitration and had resigned as the decider on the Collections Agreement, and despite the fact that Marotte was required by Court Order in March 2020 to be replaced in the Arbitration, Defendants continued to bill UP for alleged work on the Arbitration by multiple attorneys from 2017 into November 2022, which, due to Marotte's termination as arbitrator, clearly was not services "for actually conducting and administrating the arbitration" or fees "incurred in connection with [Marotte's] role as a member of the Panel." Marotte continued to pay SPSK for those invoices, which he never provided to UP, and without providing any reports of those payments to UP until 2022.

85.    Defendants abused the authority entrusted to them by Lopatin and Capparelli to review and pay the Arbitration invoices by, among other breaches: billing Plaintiff at an unauthorized rate; allowing other SPSK attorneys to bill Plaintiff for the Arbitration, even after Marotte was terminated as the neutral arbitrator; billing for work that was not actually conducting and administrating the Arbitration or in connection with Marotte's role on the arbitration panel; allowing the other chosen arbitrators to bill for work (and Marotte paying the bills with UP escrow funds of those other arbitrators) that was outside the scope of the arbitration agreements; billing for work allegedly performed after Marotte had been terminated as the "neutral" Arbitrator years before; and refusing to provide the unredacted Arbitration invoices to Lopatin and Capparelli.

86.    As a proximate result of Defendants' material breaches of the 2013 Arbitration Agreement and 2015 Arbitration Agreement, UP has incurred substantial damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for compensatory damages in an amount to be determined at trial, disgorgement of arbitration fees paid to SPSK, along with interest, attorney's fees, costs of suit and any other or further relief for Plaintiff that the Court finds just and equitable.

## COUNT THREE

## BREACH OF FIDUCIARY DUTY

87.     Plaintiff repeats and realleges all of the allegations contained above as if fully set forth herein.

88.     As Plaintiff's attorneys, Defendants had a fiduciary relationship with Plaintiff. Defendants also had separate and additional ethical and professional responsibility duties to Plaintiffs.

89.     As a result of their long-term relationship, Plaintiff believed that Defendants were representing Plaintiff's best interests and that Defendants would disclose any potential conflicts of interest to Plaintiff.  Plaintiff put its trust in Defendants and anticipated that Defendants would represent Plaintiff's interests to the fullest extent and with the loyalty, care, ethical and other duties mandated of an attorney-client relationship, and Plaintiff relied on Defendants to do so.

90.     Defendants were required to represent Plaintiff with the loyalty, care and professional responsibility expected of attorneys under the common law and the rules of ethics and professional conduct.

91.     Defendants owed Plaintiff a duty to deal honestly and fairly with Plaintiff and to take the actions reasonably necessary and appropriate to protect Plaintiff's interests.

92.     Defendants breached their fiduciary duties to Plaintiff by, among other misconduct: (i) representing V3 in a transaction directly adverse to UP without UP's knowledge or consent; (ii)

26

despite the fact that Defendants were representing UP, raising V3's interests above UP's interests in connection with the V3 Loan; (iii) intentionally or recklessly failing to prepare the new loan documents that were required to evidence the new V3 Loan; (iv) intentionally or recklessly providing V3 with the false means to destroy UP's credibility in the V3 Litigation, leading to UP's total loss in the V3 Litigation rather than, at the very minimum, settling the matter for $200,000; (v) approving DMK's invoices in the V3 Litigation for work that would not have been necessary but for Marotte's improper actions, as well as other improper actions and omissions in connection with the V3 Litigation; (vi) submitting misrepresentations and half-truths to the Superior Court regarding the V3 Loan, which ultimately resulted in UP's loss in the V3 Litigation; (vii) intentionally or recklessly failing to properly manage UP's escrow accounts and intentionally and improperly withholding UP's assets for months; (viii) intentionally or recklessly failing to provide timely and adequate trust account reporting to UP; (ix) intentionally or recklessly billing UP for time spent by SPSK attorneys other than Marotte to do improper work on the Arbitration, which, on information and belief, had nothing to do with the Arbitration and rather was an improper money grab by UP's long-time attorneys (to whom the jointly-owned Lopatin and Capparelli companies had paid over $3.3 million dollars since 2006); (x) overpaying SPSK invoices despite the fiduciary and ethical duties as an escrow agent to properly handle UP's funds; (xi) overpaying the other arbitrators on the arbitration panel's invoices for items that were outside the scope of the arbitration agreements, despite the fiduciary and ethical duties as an escrow agent to properly handle UP's funds; (xii) billing UP for over five years after Marotte was terminated as an arbitrator, and paying SPSK for most of those bills from the escrow or attorney trust account of UP; (xiii) putting Defendants' own interests above the interests of UP by, among other things, demanding, in 2015 and again in 2018 through 2020, a new arbitration agreement when one was not needed;

and (xiv) having a pattern and practice of deceiving their client UP and making multiple and repeated misrepresentations to Plaintiff regarding various matters.

93.     Defendants' conduct was particularly egregious, because they knew about their failures, their conflicts of interest and the serious improprieties that were occurring with respect to the V3 Loan, the V3 Litigation and the Arbitration, and nevertheless continued to advance their own self-interests and to unjustly take substantial fees from UP.

94.     As a result of Defendants' multiple serious breaches of fiduciary duty to Plaintiff, Plaintiff has incurred substantial damages by, among other ways, losing its interest in the V3 Loan, being frustrated in its attempts for access to information that is necessary for UP to complete its 2022 tax returns, losing control of millions of dollars for four months while Defendants delayed responding to Plaintiff's requests to transfer UP's funds to a new escrow agent, and continuing to withhold $130,000 of UP's funds for eight months (and counting) under the improper pretext that the monies are owed to SPSK for "fees" that were not properly earned.

95.     As a result of Defendants' serious misconduct, punitive damages are appropriate to punish and deter Defendants from committing future such wrongdoing, which is a real and not hypothetical prospect, because Defendants continue to practice law and market their legal services to the public.

**WHEREFORE**, Plaintiff demands judgment against Defendants: (i) for compensatory damages in an amount to be proven at trial; (ii) imposing punitive damages in an amount to be determined at trial; (iii) ordering disgorgement of prior attorneys' fees paid to Defendants in an amount to be determined at trial; (iv) allowing Plaintiff to recover interest, attorneys' fees and expenses; and (v) granting Plaintiff such other and further relief as the Court deems just and equitable.

## **COUNT FOUR**

## **TURNOVER OF FUNDS AND DOCUMENTS**

96.     Plaintiff repeats and realleges all of the allegations contained above as if fully set forth herein.

97.     Attorneys are required to hold property or funds of clients in trust.

98.     Because funds deposited into a trust account do not belong to the attorneys, such funds cannot be used as collateral for an alleged or actual obligation to the attorneys.  Rather, an attorney is obligated to promptly deliver to the client any funds or other property that the client is entitled to receive.

99.     SPSK was engaged to act as an escrow agent for UP and other companies jointly owned by Lopatin and Capparelli.

100.     UP deposited millions of dollars with SPSK, as escrow agent.  The funds were not intended to be used for any purpose but those specifically authorized by UP, Lopatin and Capparelli.

101.     As set forth above, among other egregious and unethical actions, Defendants have improperly and intentionally refused to provide Plaintiff with: (i) unredacted invoices from the Arbitration so that Plaintiff can demonstrate to the Court that Defendants improperly billed Plaintiff in multiple ways; (ii) trust account detail reports for all of UP's SPSK accounts, including but not limited to, the arbitration account, so that Plaintiff can properly complete its 2022 tax returns and determine whether Defendants' actions with respect to the funds Defendants held in trust for UP were treated appropriately; and (iii) the $130,000 of UP's funds currently being improperly withheld from UP.

102.    Despite Plaintiff's multiple demands for the turnover of UP's funds and documents and information to which UP is entitled, Defendants have intentionally ignored Plaintiff's repeated requests, in violation of both the common law and the Rules of Professional Conduct.

103.    As a result of Defendants' improper refusal to turn over the trust account detail reports, UP is incurring irreparable harm by not being able to complete its 2022 tax returns.

104.    Additionally, as a result of Defendants' improper refusal to turn over UP's funds held in trust, UP has incurred monetary damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants compelling Defendants to produce to UP: (i) all unredacted invoices of SPSK relating to the Arbitration; (ii) trust account detail reports for UP's accounts from inception; and (iii) the $130,000 of UP's funds currently being improperly withheld since October 2022 from UP.  Plaintiff further demands that the Court impose punitive damages against Defendants for their egregious breaches of professional conduct and allow Plaintiff to recover its attorneys' fees and costs and also grant Plaintiff such other and further relief as the Court deems just and equitable.

McANDREW VUOTTO, LLC
Attorneys for Plaintiff

By:    _/s/Jonathan P. Vuotto_
        Jonathan P. Vuotto

Dated: June 16, 2023

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable in this action.